MARY ELIZA HYNES et al., Respondents, *v.* KATE McDER-
MOTT et al., Appellants.

In the absence of proof it will not be presumed that the law of marriage of another country is different from that of this State.

In an action of ejectment where plaintiffs claimed as the widow and children of H., who died intestate, and where the validity of the marriage was in question, sufficient facts were proved to establish a valid marriage under the law of this State, part occurring in England; part on board a

vessel crossing the channel from an English to a French port, and part in France. It was conceded that sufficient was not shown to constitute a valid marriage under the law of England. There was no proof as to the nationality of the vessel, or of the law of France in reference to marriage. *Held,* that conceding a vessel at sea has with it the law of marriage of the nation whose flag it flies, it was not to be presumed that the nationality of the vessel in which the parties crossed the channel was that of a country whose law of marriage was proved to be different from our own, nor was it to be presumed that the law of France on this subject was different, and that, therefore, a finding that there was a valid marriage was justified.

As to whether where acts are proved which would constitute a valid marriage if done in this State, but not in the country where they took place, they will establish a relation which will be upheld as a valid marriage in this State, *quære.*

It was claimed on appeal that a judgment for the entire *mesne* profits had been taken against two of the defendants without proof of possession by them, or either of them, of the entire premises. *Held,* that as it did not appear by the record that the point was brought to the attention of the trial court it was not available here.

An expert in handwriting, when speaking as a witness only from a comparison of handwriting, should have before him in court the two writings compared.

A comparison of a signature in dispute with photographic copies of other writings, for the purpose of getting an opinion from an expert as to the character of the signature as real or feigned, where the originals from which the copies are made are not brought before the jury and cannot be shown to other witnesses, should not be permitted, at least where there is no proof as to the manner and exactness of the photographic method used.

L., a detective employed by defendants to procure evidence against plaintiffs, after the commencement of the action, and while engaged in taking evidence on commission of a witness in behalf of defendants, saw certain signatures which plaintiff M. (the alleged widow) admitted to be her genuine signatures. L. was called as a witness to prove the signature of M. to a lease, executed in another name while she claimed to be the wife of deceased. The evidence was rejected. *Held,* that L. showed sufficient knowledge to authorize him to give an opinion; but that the case could not be distinguished from that of genuine writings furnished to a witness to enable him to become a witness; and so that the rejection of the evidence was not error.*

The method and the sufficiency of proof of foreign laws considered.

Defendants' counsel presented to the court thirteen written requests to charge. The court, after remarking that there were certain requests to

* This case was tried prior to the passage of the act (chap. 36, Laws of 1880) allowing proof of signature by comparison of handwritings.

charge which it would read, then read nine of the requests. The court did not state in terms as to whether it gave them to the jury as the law, nor did it refuse in terms to charge the four requests not read. *Held,* that the inference was that the court intended to charge in accordance with the requests read, and declined to charge the residue.

One of the requests so declined was that the presumption is, as the vessel sailed from an English port, she was an English vessel. *Held,* that the court properly refused so to charge.

(Argued June 11, 1880; decided September 21, 1880.)

APPEAL from judgment of the General Term of the Court of Common Pleas, in and for the city and county of New York, affirming a judgment in favor of plaintiffs entered upon a verdict. (Reported below, 7 Daly, 513.)

The nature of the action and the facts are set forth sufficiently in the opinion.

*John Hallock Drake* for appellants. The court erred in excluding the testimony of the witness as to the handwriting of Elizabeth Saunders, on the ground that it had not been shown he had ever seen her write her signature, or had ever received any letters signed by her, or had shown in any way that he was acquainted with her signature. (Cowen & Hill's Notes to 1 Phil. Ev. 1324, 1325 ; 2 Stark Ev. 373, 374 [6th Am. ed.] ; *Johnson* v. *Daverne,* 19 Johns. 1335.) The court erred in charging the jury that if the alleged marriage in Cleveland street was made with the intention that it should be a marriage according to the laws of this State, and with the intention in the future of bringing the woman to live here with him as his wife, it constitutes a valid marriage. (See fols. 640 to 742 inclusive ; *Connelly* v. *Connelly,* 2 Eng. L. & Eq. 570; *Dalrymple* v. *Dalrymple,* 2 Hagg. Con. 271; *Scrimshire* v. *Scrimshire,* id., 395, 407–8, 421–22; *Medway* v. *Needham,* 16 Mass. 157, 158 ; *West Cambridge* v. *Lexington,* 1 Pick. [18 Mass.] 506, 507, 510 ; *Putnam* v. *Putnam,* 8 Pick. [25 Mass.] 433 ; *Stevenson* v. *Gray,* 17 B. Monroe [Ky.], 193, 207–8, 212 ; *Matter of Webb,* 1 Tucker, 372, 373 ; *Davis* v. *Davis,* 1 Abb. N. C. 140.) The contract alleged to have been

entered into in England was void by the statutes of that country. (Tyler on Infancy and Coverture, 815, § 625; Browning on Marriage and Divorce, 33, 34 and 35; *Ferris* v. *The Public Administrator*, 3 Bradf. 151, 169, 170; *Durand* v. *Durand*, 2 Sweeney, 318, 319.) It is a universal rule that neither party to a contract which the law forbids, and which it declares to be void, acquires any rights under it. (*Amory* v. *Amory*, 33 How. 490; *Cropsey & Wife* v. *Ogden*, 1 Kern. 228; *Smith* v. *Woodworth*, 44 Barb. 198.) The *lex loci* determines the validity of the marriage contract. (*Canjolle* v. *Ferrie*, 26 Barb. 177; *Clayton* v. *Wardell*, 4 Comst. 230.) The contract, being void by the law of England, was void everywhere and could be enforced nowhere. (Bright's Husband & Wife, p. 7; *Hyde* v. *Goodenow*, 3 Comst. 266.) If the alleged ceremony took place in an English ship, the parties were amenable to English law, and were, in fact, on English territory. (*Marshall* v. *Murgatroy*, L. R., 6 Q. B. 31.) The presence of a priest or clergyman, is absolutely necessary to the validity of a common-law marriage. (*Queen* v. *Millis*, 6 C. & Fin. 10 Appeal Cases, 534; House of Lords, 1843–4; *Beamish* v. *Beamish*, 9 House of Lord Cases, 274.)

*Joseph H. Choate* for respondents. The marriage acts of Great Britain did not apply, the parties to the marriage being American citizens. (*Ruding* v. *Smith*, 2 Hagg. Const. 390; *Hartford* v. *Morris*, id. 428, 486; *Middleton* v. *Janverin*, id. 437; *Latour* v. *Teesdale*, 8 Taunt. 830; *Hartfords* v. *Higgins*, 2 Hagg. Const. 432; Savigny, 8, § 381; Story's Conflict of Laws, § 113; Wharton's Conflict of Laws, §§ 169, 170, 173, 180; *Simonton* v. *Wallace*, 2 Swaby & Tr. 67; Friedburg, 127, 150; Die Herrschaftder Gesetze, 79; Wharton's Laws of Evidence, 100, § 83; *Hutchins* v. *Kimmel*, 31 Mich. 133; *Newbury* v. *Brunswick*, 2 Vt. 151; *Brower* v. *Brower*, 1 Abb. Ct. App. 214; *Loring* v. *Thorndyke*, 5 Allen [Mass.] 257; *Davis* v. *Davis*, 1 Abb. N. C. 140.) There being no proof of the nationality of the vessel upon which the contract took place, the law presumes that the parties were upon the high seas,

exempt from the local jurisdiction of any foreign State, and subject only to the same law which here prevails. (*Piers* v. *Piers*, 2 H. of L. 331; *Morris* v. *Davies*, 5 Cl. & Fin. 163; Bishop, Marriage and Divorce, vol. 1, 457; *Steadman* v. *Powell*, 1 Add. Ex. 58; *Catterall* v. *Sweetman*, 1 Robt. 304; *Legeyt* v. *O'Brien*, Milw. 325; *Maxwell* v. *Maxwell*, id. 290; *Else* v. *Else*, id. 146, etc.) A contract *per verba de praesenti* between two persons capable of marrying, to take each other for husband and wife, is a valid marriage by the laws of New York. (*Bissell* v. *Bissell*, 55 Barb. 325; Bishop on Mar. & Div., §§ 78, 162; *Fenton* v. *Reed*, 4 Johns. 52; *Clayton* v. *Wardell*, 4 N. Y. 260; *Ferrie* v. *Pub. Adm'r*, 3 Bradf. 151; *Tummalty* v. *Tummalty*, id. 369; *Grotgen* v. *Grotgen*, id. 373; *Rose* v. *Clark*, 8 Paige, 574; *Matter of Taylor*, 9 id. 611; *Cheney* v. *Arnold*, 15 N. Y. 345; *Hayes* v. *The People*, 25 id. 390; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235.) The marriage proved by the defendants' witness and found by the jury as having taken place in France is valid. (*Canjolle* v. *Ferrie*, 23 N. Y. 90.) There was no error in the refusal of the court to permit the witness, Loader, to testify as to the handwriting upon the lease, or the handwriting upon the British registry of births, which was not produced in the court, but only examined by him in England. (*The Fitzwalter Peerage*, 10 Cl. & Fin. 193; *Doe* v. *Suckermore*, 5 Ad. & El. 703; 1 Wharton's Evidence, § 707; *Keith* v. *Lothrop*, 10 Cush. 453; *McKeone* v. *Barnes*, 108 Mass. 344; *Commonwealth* v. *Coe*, 115 id. 481; *Magie* v. *Osborn*, 1 Robt. 689; *Cunningham* v. *Hudson River Bank*, 21 Wend. 557; *Boyle* v. *Colman*, 13 Barb. 42; *Van Wyck* v. *McIntosh*, 14 N. Y. 439; *Randolph* v. *Loughlin*, 48 id. 456; *Goodyear* v. *Vosburg*, 63 Barb. 154; *P. & W. C. R. R.* v. *Hickman*, 28 Penn. St. 318; *Woodward* v. *Spiller*, 1 Dana, 179; *Pierce* v. *Northey*, 14 Wis. 9; *Niller* v. *Johnson*, 27 Md. 6; *Burdick* v. *Hunt*, 43 Ind. 381; *Jumperty* v. *People*, 21 Ill. 375; *Kernin* v. *Hill*, 37 id. 209; *Moore* v. *U. S.*, 91 U. S. [1 Otto] 270; *Tome* v. *R. R.*, 39 Md. 90–93; *Smith* v. *Walton*, 8 Gill, 86; *Dubois* v. *Baker*, 30 N. Y. 355; *Baker* v. *Squier*, 1 Hun, 448; *Bank of Com.* v.

*Mudgett*, 44 N. Y. 514.) There was no presumption that the vessel upon which the parties sailed across the English channel was under the English flag. The presumption in favor of marriage and of legitimacy requires the court to presume that it was not other than the American flag, and that the American law prevailed thereon. (Wharton on Conflict of Laws, § 356; Woolsey's Int. Law, §§ 54, 64; Story's Conflict of Laws, § 375; Wheaton, part 2, chap. 2, § 4; Lawrence's notes; *R.* v. *Lesley*, 8 Cox's C. C. 269.)

FOLGER, Ch. J. This is an action of ejectment, brought to recover possession of lands once of William R. Hynes, now deceased. He died intestate. The plaintiffs claim to be his widow and his sons respectively. If that be fact, the right to maintain the action cannot be denied. Whether it be the fact, depends upon the validity, as a marriage contract, of what took place in his life-time, between the intestate and the plaintiff who now claims to be his widow, and at times before the births of the other plaintiffs. Enough took place at those times, if it had been done in the territory of this State, to have made a valid contract of marriage. Enough took place afterward to furnish a presumption, under the laws of this State, of a prior-legally formed and subsisting marriage relation. By the law of this State, a man and a woman who are competent to marry each other, without going before a minister or magistrate, without the presence of any person as a witness, with no previous public notice given, with no form or ceremony civil or religious, and with no record or written evidence of the act kept, and merely by words of present contract between them, may take upon themselves the relation of husband and wife, and be bound to themselves, to the State and to society, as such; and if after that the marriage is denied, proof of actual cohabitation as husband and wife, acknowledgment and recognition of each other to friends and acquaintances and the public as such, and the general reputation thereof, will enable a court to presume that there was ·in the beginning an actual and *bona fide* mar-

riage. (*Brinkley* v. *Brinkley*, 50 N. Y. 184, and cases there cited.)

But what passed between the intestate and the adult plaintiff took place out of the territory of this State. Part of it took place upon English soil; and it is conceded that it did not make a lawful marriage, according to the law of England. Part of it took place upon the sea, in a vessel clearing from an English port and crossing the channel to a French port. Part of it took place in France.

In some state of the case here might come in the question, whether, if the acts which would make a valid marriage when done in this State are done outside its bounds, and not in accordance with the law of the place where done, they will make a relation which will be upheld as a valid marriage by the laws of this State?

But this question we need not decide. There is no proof of what is the law of marriage in France, and we will not presume that it is different from that of this State. (*Monroe* v. *Douglass*, 5 N. Y. 447; *Savage* v. *O'Neil*, 44 id. 298.) There is no proof of the nationality of the vessel in which the parties crossed the channel, and we will not presume that it was that of a country whose law of marriage has been proved in this case to be different from that of this State; even if we are required to hold that a vessel on the seas has with it the law of marriage of the nation whose flag it flies. There was enough in the testimony of what took place between the parties at sea, and between them, their friends and acquaintances and the public while they were in France, to sustain the verdict of the jury, that they were husband and wife in accordance with the law of this State. (*U. S. Trust Co.*, *Recr.*, v. *Harris*, 2 Bosw. 75.) Though they cohabited in England before crossing the channel, the testimony, while it does not prove a marriage in accord with English law, shows enough for a jury to find therefrom that there was the purpose and a form of marriage; that there was a refusal on the part of the woman to commence a meretricious cohabitation, and a yielding on

the part of the intestate to her demand for marriage before cohabitation should be had.

A marriage having been thus found on proof enough to sustain the verdict, the legitimacy of the minor plaintiffs, as the sons of the intestate, is beyond dispute in the case at this time. The judgment for the plaintiffs is to be sustained, unless error is shown by some of the other points made by the defendants.

1st. The defendants contend that the General Term declined to use the power it had to set aside the verdict and grant a new trial.   We are not able from the record to discover that it did so.   If we turn to the opinions delivered, we find that matter discussed and a conclusion reached.   We cannot disturb the judgment on that ground.

2d. It is claimed that the judgment for the entire *mesne* profits has been taken against two of the defendants without proof of the possession by them, or either of them, of the entire premises recovered.   We do not find in the record that this point was brought to. the attention of the trial court. The motion to dismiss the complaint was general, that the plaintiffs had failed to make a cause of action against the defendants.   The motion to direct a verdict was the same. The requests to charge do not mention it.   One exception to the charge speaks of the direction to the jury to find the rental value, but it does not bring to the attention of the court the specific objection now made.

3d. It is claimed that the charge was erroneous, in saying to the jury that it was essential to find whether the alleged marriage in Cleveland street was entered into by the intestate with the intention of effecting a marriage under the laws of the State of New York, and with the intention of returning to this State with the adult plaintiff as his wife.   The error set up in the points is, that there was no evidence in the case on which the jury could rest that finding.   Without going into detail, we think that there was testimony; how strong it was we need not say.

4th. The court did not allow the witness Loader to testify that the handwriting of the signature to the lease of the prem-

ises in Leverton street was that of the adult plaintiff. The witness had never seen her write; he had no knowledge of her handwriting save that got by looking upon two writings other than the signature to this lease, which other writings she had acknowledged in his presence and with the writings then before them, to have been penned by her. Those other writings were two signatures of names of persons and one written name of a place of residence, as shown by a signature book kept by a bank at which she had opened two accounts of money deposited by her. These writings were not in evidence in the case; that is, they were not produced before the jury and kept in court throughout the trial. The witness who controlled them was examined beyond the seas on commission. He produced them before the commissioner but refused to part with them. Copies were taken in manuscript by the commissioner and annexed to the deposition of the witness. Copies were also taken by the photographic process and certified to by the commissioner and annexed to the deposition of the witness. The witness Loader was presented to the court as doubly competent to speak on an issue as to the genuineness of handwriting, as an expert, and as having personal knowledge of the handwriting of the adult plaintiff. It does not appear from the case that the trial court determined whether he was qualified to speak as an expert. We will assume that he was, and that had the trial court thought it needful to pass upon the question, it would have held that he was. Yet, in our judgment, it was not proper to receive his testimony as that of an expert, and by a comparison of writings. An expert in handwriting, when speaking as a witness only from a comparison of handwriting, that is, with two pieces of it in juxtaposition under his eye, should have before him in court the writing to which he testifies and the writings from which he testifies; else there can be no intelligent examination of him either in chief or cross; nor can there be fair means of meeting his testimony by that of other witnesses. This requirement is included in the rule that there can be no comparison of handwriting, unless the pieces of writing by which comparison is made are properly in evidence in the case for

some purpose other than that of being compared. (*Randolph*
v. *Loughlin*, 51 N. Y. 456; *Dubois* v. *Baker*, 30 id. 355;
*Miles* v. *Loomis*, 75 id. 288.)  The nearest approach to having
before the witness at the trial the writings by which compari-
son had been or was to be made, was the bringing of the
photographic copies.  There was no proof of the details of the
process by which they were taken, nor as to accuracy of the
work.  We think that a comparison of a signature in dis-
pute, with such photographic copies of other writings, for
the purpose of allowing an opinion from an expert as to the
character of the signature as real or feigned, when the originals,
from which the copies are made, are not brought before the
jury, and may not be shown to other witnesses, ought not to
be permitted.  Photographs that have been taken of persons
found dead have been admitted in evidence in this State, in
aid of other proofs of identity, but not alone.  They were
characterized as slight evidence in addition to other and more
reliable testimony. (*Ruloff* v. *The People*, 45 N. Y. 213.)
A photographic picture was more unreservedly admitted as
evidence upon the question of identity of person in *Udder-
zook* v. *Commonwealth* (76 Penn. St. 340).  And in another
case, when the genuine signature and the disputed signature
were both brought into court, magnified photographic copies
of each, together with the originals, were submitted to the in-
spection of the jury, and it was held not to have been error.
(*Marcy* v. *Barnes*, 16 Gray, 162.)  But copies of letters in a
letter-book, produced by impress or by a machine, have been
rejected. (*Comm.* v. *Eastman*, 1 Cush. 189.)  It would be
carrying the matter much farther, to permit an expert to com-
pare photographic copies of signatures, and therefrom to testify
as to the genuineness of a disputed signature.  We may
recognize that the photographic process is ruled by general
laws that are uniform in their operation, and that almost with-
out exception a likeness is brought forth of the object set
before the camera.  Still, somewhat for exact likeness will
depend upon the adjustment of the machinery, upon the at-
mospheric conditions, and the skill of the manipulator.  And

in so delicate a matter as the reaching of judicial results by the comparison of writings through the testimony of experts, it ought to be required that the witness should exercise his acumen upon the thing itself which is to be the basis of his judgment; and still more, that the thing itself should be at hand, to be put under the eye of other witnesses for the trial upon it of their skill. The certainty of expert testimony in these cases is not so well assured as that we can afford to let in the hazard of errors or differences in copying, though it be done by howsoever a scientific process. Besides, as before said, there was no proof here of the manner and exactness of the photographic method used. It was right not to receive Loader's evidence as that of an expert.

The witness was also offered as one having acquaintance with the handwriting of the adult plaintiff. All his means of knowledge have been stated. The testimony was finally rejected, after the objection made to it, that it was a collateral fact whether the lease was signed by the plaintiff, and that the defendants had proved by her that she had not signed it. The objection is not well put, in claiming that the defendants proved by the plaintiff that she did not sign the lease. At one time she said that she did not recognize the signature to it as hers; but she would not say that it was not hers, while she would not admit that it was. At another time she was explicit in denial. But her testimony on this head was not conclusive. Neither can we assent that the fact sought to be proved was a collateral fact, in a sense that precluded the defendants from offering any other testimony upon it than that of the plaintiff herself. She was the witness of the defendants, to be sure, and they could not impeach her. But if she was mistaken in her testimony, or forgetful, so that she could not speak as to a matter, the defendants were not shut out from proving the fact, if material, by other witnesses. It was material, if this plaintiff, during the time that, as she now claims, she was the wife of Hynes, and entitled and bound to bear his name, was entering into written contracts in another name, which was that of the wife, or widow still unmarried, of another man. The testi-

mony offered tended to prove that. We think, therefore, that that objection was not good. The prior objection was in effect that Loader had not shown that he was acquainted with the signature of the plaintiff. Testimony as to handwriting is testimony of opinion. Any person acquainted with it may be permitted to give his opinion of it. The acquaintance need not come from having seen the person write. It may be formed from seeing writing under such circumstances as put it beyond doubt that it was a true signature. In this case the witness Loader had seen writing admitted by the plaintiff to be hers; thus he had seen her genuine handwriting. If the case was so confined as that the correctness of the holding at the circuit would hang upon whether the view of one piece of genuine handwriting would qualify one to speak as a witness as to the genuineness of another and a disputed signature, we find authority to show that a holding rejecting the testimony would be incorrect. (*Hammond* v. *Varian*, 51 N. Y. 398; *Garrells* v. *Alexander*, 4 Esp. Cas. 37.) The competency of a witness is not determined by the degree of his knowledge. If he has had means of becoming acquainted with the handwriting in question, he is competent to speak, and the weight of his testimony is for the jury. The objection, however, was broader than that, and covered all the circumstances in which Loader had been placed with regard to this handwriting. It appeared that he was by calling a private detective, and had gone to England as such in the employ of the defendants, after the commencement of this action; that it was while in the pursuit of evidence against the plaintiffs that he learned of this bank book writing; and while engaged in taking the evidence in behalf of the defendants of a witness on commission that he saw the writing and heard the admission of the plaintiff that it was made by her. His acquaintance with her handwriting was from an examination of these two pieces of it, and it was formed while he was, as a hired agent, in quest of testimony with which to combat the plaintiffs' case, and of testimony to be made from the handwriting of the adult plaintiff. It is not to be distinguished from a case of genuine writings fur-

nished to a person to enable him to become a witness as to a disputed signature. It is clear that if the genuine writings had been made or chosen for his inspection by the party who called him as a witness, so as to qualify him to speak, his testimony, to be based upon an acquaintance got from a view of them, would not be received. (*Stranger* v. *Searle*, 1 Esp. N. P. C. 14; *Tome* v. *Parkersberg R. R. Co.*, 39 Md. 36; *S. C.*, 17 Am. Rep. 540.) And it has been held at *nisi prius*, that when the acquaintance is formed from the view of writings admitted by the attorney of the writer to be genuine, the witness will not be allowed. (*Greaves* v. *Hunter*, 2 Carr. & Payne, 477.) Though, on the other hand, when the genuine writing from which the witness got his knowledge was to a paper filed in the cause by the opposite party, the testimony was allowed. (*Smith* v. *Sainsbury*, 5 Carr. & Payne, 196.) These cases exemplify how lacking in uniformity are the rulings on this matter, and how delicate a question it is to handle. The last two cases are not directly in point, inasmuch as it did not appear that the witness, when he saw the genuine writings, was seeking the means of making acquaintance, so that he might testify therefrom. A difference between the case in hand, and those cited above from Espinasse and the Maryland Reports, is that in the latter two, the genuine signatures were made or chosen by the parties who wished it to appear to the witness that the disputed signature was unlike the genuine ones inspected by him; while, in the former, the genuine signature is used in the case, and is admitted to be genuine by the party against whom the witness is called. Still, it is a case of signatures selected in the interest of the party who calls the witness. They were pitched upon by the witness himself who, in the hire of the party, had been sent in quest of hostile evidence, and that after the commencement of the action. All the stimulus upon him, and all the impulses of his calling, were against impartiality in selection of specimens. The distinction is taken in *Fitzwalter Peerage Case* (10 Cl. & Fin. 193) between the testimony of a witness who, intending to be a witness, has inspected genuine documents, for the purpose of forming an acquaintance with

the characteristics of a certain handwriting, and that of one who, in the course of business, without having in view the being a witness, has used the same documents, and thus got an acquaintance. In our judgment, the evidence is open to the objections that have been held fatal to testimony as to handwriting, created *post litem motam.* We think that upon all that transpired on the trial in the testimony of Loader, and the objections made, the trial court erred not in ruling out the question.

The legislature of this State has, this year (Laws of 1880, chap. 36), passed an act which is intended to allow proof of signature by comparison of handwritings, and which perhaps will forestall for the future much discussion of this topic. That statute, however, is probably yet to be the subject of judicial interpretation.

5th. What we have just said applies to the defendants' offer of testimony as to the handwriting in the book of registry of births. Nor is there force in the position of the defendants that the plaintiffs then waived objection to the competency of the witness to speak of handwriting. The appeal book speaks, at the folio where the testimony is rejected, of a general objection. But it is plain that it was a continuation of the same objection that had been before made to that testimony. It would be a forced supposition that the defendants' counsel was misled at the trial and thereby omitted to bring forward other kindred testimony that he held in reserve.

6th. The next point is that of the rejection of the offer to read from the books claimed to contain the law of France. It is well enough to consider it, though the result we reach is not so determinate as may be wished for. There were shown to the witness two volumes of a printed work, and a single volume of another work. He said that the two were the French Code; and that the three were all the French Acts, the five codes and state laws of France. The very books thus shown to him he saw then for the first time. He had been a practicing lawyer in France from 1837 until 1862, and left that country in 1863. The date of the edition of the two

volumes was 1859.  The edition date of the other was 1877. He said that they constituted a printed copy of the Code of Statutes of France, as they existed when he practiced there; that he had occasion to use and did use the printed statutes of France every day in the courts of that country, and that he had not the slightest doubt that the two volumes produced constituted a printed copy of the statutes, or book which was commonly received in the judicial tribunals of France as evidence of the existing laws thereof; that he had no doubt that it was an exact copy of the French law; that it was the same thing, the only difference being in the notes of the author, M. Rogron.  He would not say that that opinion was based upon an examination of the books, and did say that it was founded on reason.  He first saw the volumes in court on the day that he was examined, and had not looked into the books, save at the title page; but he said that that very copy he would use before a French tribunal the first time he had occasion to quote the French law, and that the work of M. Rogron is received therein as a proof of the existing law.  We have here given all of the testimony of this witness that we deem material in the disposition of the point now to be determined.  The books are not before us, and no other description of them than that contained in the testimony of the witness.  It will be seen that the books he had before him were the publication of a private person.  They were not proven to have been published by the authority of France, nor does it appear that they purported so to have been.  It was testified, however, that they were, at the time spoken to by the witness, received in the tribunals thereof as proof of the then existing law.  The Old and the New Code provide, in nearly the same terms, for a mode of proving the statute law of a foreign country.  (Old Code, § 426; New Code, § 942.)  The New Code also (§ 962) permits the proof of an act according to the rules of the common law, or by any other competent proof.  We think that the testimony of this witness would not bring the offer to read the books within the rule of the common law.  As to what that is held to be in England, see *Baron de Bode's Case* (8 Q.

B. 208; *Earl Nelson* v. *Lord Bridport*, 8 Beav. 527; *Sussex Peerage Case*, 11 Cl. & Fin. 85, 114.) To prove the written law of a foreign state by a printed book purporting to contain it, though the book is sustained by the testimony of a witness familiar with the law, was not permitted, so far as we can find, in this State, before the codes. (*Packard* v. *Hill*, 2 Wend. 411; see *S. C. Hill* v. *Packard*, 5 Wend. 375.) And again it was held, that to prove the statute law of a foreign state, there must be produced, a copy authenticated there, or a sworn copy. (*Lincoln* v. *Battelle*, 6 Wend. 482.) And such proof as was produced in our case, according to that decision, would not have been deemed equivalent to a sworn copy. (Id. 483–4; *Chamoine* v. *Fowler*, 3 Wend. 173). Even if that testimony would meet the requirement of the New Code (§ 942), for the time of which the witness spoke, from 1837, when he was first licensed to practice, until 1862, when he ceased to practice, a question arises. The period, for the existing law of which the trial court was seeking, was from a late day in June, 1871, until the expiration of a few weeks thereafter. It is claimed, however, that the law of France having been shown as it existed in 1862, we are to presume that it continued the same until the year 1871. Presumptions of the continued existence of the same state of things arise when the things are continuous in their own nature. They are founded on the experienced continuance or immutability for a longer or shorter period, of human affairs. What may be presumed of one country, and one state of society, may not so readily be presumed of another. Thus, at one time in England it was held, that it will not be intended that a man alters his trade or profession, but by presumption he continues in it through life. (*Tuthil* v. *Milton*, Yelv. 158.) It has been held that a partnership, an agency or a tenancy, once shown to exist, is presumed to continue until it is proved to have been dissolved; and so far has this been carried, that, where it was admitted that a partnership had been in existence in 1816, it was, in the absence of all evidence to the contrary, presumed to be still continuing in 1838 (*Clark* v. *Alexander*,

8 Scott N. R. 161), which seems to us an extreme carriage of the rule.   Would it do, in the United States, to base judicial action on that presumption, in the breadth of it as stated in those cases?

It has indeed been held that the statute law of another State of this Union having been proven, it must be presumed to exist until shown by good evidence to have been repealed. (*Raynham* v. *Canton*, 3 Pick. 293.)    Statutes of our own State are read to the courts, and they stand as the law until a repealing statute is produced.    That is, however, on the theory that the judges know what is the statute law of their own State, and need to hear it, only to refresh their memory. (*Lincoln* v. *Battelle, supra,* 483.)    It may be that if the question was before us, whether, in a case presenting it, that presumption should be made, we would feel obliged to make it. But then even there would arise the query, whether by a true interpretation of the Code (§ 942), it must not be held to require that as " the existing law which may be proved," is the law existing at the very time of the transaction that is in controversy, the proof to be received must be addressed directly to that time, and show by direct assertion that then was the book of statute law now produced admitted in the judicial tribunals of the foreign country as evidence of its law.

It will not fail of notice, that the witness had not read these very books, nor a page of them, save the title page.    It must have struck the circuit judge, as it strikes us, as difficult to conceive how one could testify that the contents of these books, issued from the press as a venture of private business, without the impress of public or official authority, contained the law of France, as it existed at any given time, when he knew not from perusal what were the contents of the books. It is to be noticed further of one of them that it was issued in the year 1877.    It is impossible that this book, or a book of the same edition, could have been used in 1862, and prior thereto, before the judicial tribunals of France, as evidence to them of the existing law of that State.    And as the witness had not looked into the contents of the book, would not say

that he had made an examination of them, and did say that he founded his opinion on reason, how could he satisfy the court that those contents had ever been spread before a French tribunal as evidence of the law? The most of which the witness could satisfy the court by the testimony he gave was this: that the work of the author whom he named was usually received in the courts of France as containing its law. Whether these books were the work of that author; the witness had not informed himself by a perusal of them. He knew no more of that than what the title page told him, assisted by his reason. Verily, this is weak testimony on which to take printed books as evidence of foreign statute law, and from the contents of them to draw material for an adjudication. Now, though it is said by a text writer of repute (1 Taylor on Ev., § 48, pp. 62, 63 [7th ed.]) that in regard to foreign laws, the functions of the judge and jury do not seem to be yet well distinguished; still, it seems that it is the duty of the court to decide as to the competent knowledge of the witness, and as to the admissibility of the documents by which, or as to which, he speaks. (*Bristow* v. *Sequeville*, 5 Ex. 275; *Sussex Peerage Case, supra;* 8 Beav., *supra.*) That duty was on the trial judge in our case, and we hesitate before we will say that he was in judicial error in not deeming this witness well enough informed of the contents of these books, or the books admissible as proof of French law. It is not plain that there was error in the ruling of the trial court.

We are not compelled to pass definitely upon these questions. If it be determined or conceded that the marriage law of France, when the intestate and the adult plaintiff cohabited there, was not observed by them in making their marriage contract there, still the jury have found, as a specific verdict, that the parties did, while crossing the English channel, enter into an agreement to take each other then and there as man and wife. As we have already said, so far as appears in this case, this was a valid contract of marriage under the laws of this State, and the general verdict of the jury is thus sustained. (2 Bosw., *supra.*)

We need not, therefore, pass definitely upon the question raised by the offer of the defendants to read in evidence the books claimed to be the law of France in print.

7th. We now come to the allegations of error in the charge.

The court charged the jury, in substance, that though the transaction between the parties in England was not a valid act or contract of marriage by the laws of that country, yet that if Hynes was a citizen of this State, and did that act with the intention of marrying in accordance with the laws of this State, and of bringing the woman to this country to live with him as his wife, there was the formation of a valid married relation. The jury found, on specific questions put to them, that the facts were in accordance with the suppositions put in the charge. The defendants duly excepted. This exception we do not deem it necessary to consider. If the proposition stated in the charge be wrong, yet the jury have by other specific findings established such facts in the case as must uphold their general finding that the adult plaintiff was the wife of Hynes.

Other exceptions to the charge called to our attention by the points of the defendants have been passed upon incidentally, but sufficiently, by what we have said in the first part of this discussion.

8th. There are points made upon requests to charge and alleged refusals to charge as requested. The requests to charge are thirteen in number. When the court had charged the jury the record shows that it remarked : " There are certain requests to charge which I will briefly read. At the request of the defendants' counsel I am asked to charge." The court then repeated to the jury, in the language of the counsel, nine of the requests. It did not in terms say that it did or did not give them to the jury as the law of the case. Nor did it in terms say that it refused to charge the four requests that it did not read. The exception of the defendants was this: "Separately in each instance to the refusal and neglect of the judge to charge requests." The court read to the jury all the requests upon

which points are made except the third and fifth. We infer that the court meant to charge the jury that the requests made to them, and which it read, were well asked for. The third related to the alleged act of marriage in England, and the court had charged fully upon that. The fifth was that the presumption is that as the vessel sailed from an English port, that she was an English vessel, sailing under an English flag. We must infer that the court declined to charge this request. The defendants cite no authority to sustain it. We have not been able to find it so laid down as law.

There are noted upon the points two exceptions to the rejection of evidence. We think the court did not err therein.

We have examined the case with minuteness, and do not find that error which calls upon us to reverse the judgment.

All concur.

Judgment affirmed.