FRED J. STANBACK, JR., v. VANITA B. STANBACK.

(Filed 20 June, 1967.)

**1. Divorce and Alimony § 11—**

The court, in its charge to the jury upon the nagging of the wife as constituting such indignities to the person of the husband as to warrant a divorce *a mensa et thoro*, quoting a picturesque philippic on nagging, capped by a quotation from Proverbs as to the difficulty of living with a brawling woman. *Held:* The excerpt from the charge must certainly have been considered by the jury as a description of the wife's behavior, and constitutes prejudicial error as an expression of opinion on the facts by the court.

**2. Trial § 35—**

G.S. 1-180 proscribes the trial court from expressing or indicating an opinion on the facts, either directly or indirectly.

**3. Divorce and Alimony § 23—**

Determination of the right to custody of minor children of the marriage is the province of the trial court and not the jury, and the court must decide the question upon the evidence before it, and while the verdict of the jury in the divorce action may be considered by the court with all other relevant factors in determining the question of custody in accordance with the best interest of the children, the verdict of the jury is not controlling, and it is error for the court to so consider it.

**4. Same; Appeal and Error § 55—**

The court awarded the custody of the children of the marriage in accordance with the prior order entered in the cause under the mistaken belief that he had to do so in view of the verdict of the jury in the divorce action. *Held:* A new trial having been awarded in the divorce action, the order of custody will not be altered prior to trial unless for good cause shown earlier consideration should become necessary, but after retrial the court must consider the question of custody *de novo*.

**5. Divorce and Alimony § 18—**

The purpose of allowance of fees to the attorneys for the wife is to place her on substantially even terms with the husband in the litigation, and under the facts of this case the amount allowed to the wife's attorneys *is held* not to disclose abuse of discretion in view of the affluence of the husband and the wife's lack of funds, the amount of legal work required of the wife's attorneys, and other relevant circumstances.

APPEAL by both plaintiff and defendant from *May, S.J.,* May 1966 Civil Session of ROWAN. This appeal was docketed in the Supreme Court as Case No. 617 and was argued at the Fall Term 1966.

Plaintiff instituted this action against his wife on 29 March 1965 for a divorce from bed and board and the exclusive custody of the two minor children then born of the marriage. Plaintiff alleged that he was entitled to a divorce *a mensa et thoro* upon each of the five grounds enumerated in G.S. 50-7. Defendant, after denying that plaintiff had any grounds for divorce, filed a cross action under G.S. 50-16 for alimony without divorce. She also asked for custody of the children with visitation rights granted the father.

Plaintiff and defendant, who had known each other seven years, were married in New York City on 19 April 1958, and thereafter lived together in Salisbury, North Carolina. On the morning of 20 February 1965, plaintiff left the home and never returned. At that time, the parties had only two children, Bradford G. Stanback, born 1 April 1959, and Lawrence C. Stanback, born 27 August 1960, but defendant was pregnant with their third child. On 29 March 1965, during defendant's absence, plaintiff came to the home and took the two children away. The third child, Clarence F. Stanback, was born 29 June 1965.

On 22 April 1965, upon motion in the cause, Judge Hal Hammer Walker on a finding that defendant, for a long time, had consumed excessive amounts of alcohol, awarded plaintiff exclusive custody of the children pending the hearing on the merits. Sixteen days later, on 8 May 1965, defendant filed a motion to reconsider the question of custody. On 19 June 1965, less than two months after the date of Judge Walker's order, Judge Allen H. Gwyn concluded another custody hearing and, upon a finding of changed condition, *i.e.,* that defendant no longer used alcoholic beverages, he divided the custody of the children equally between the parents. Plaintiff appealed. This Court, being of the opinion that sufficient time had not elapsed between the two orders to support a finding of changed conditions, reversed Judge Gwyn's order. See *Stanback v. Stanback.* 266 N.C. 72, 145 S.E. 2d 332.

Upon the trial of this case on the issues, plaintiff offered evidence tending to show: From the beginning of their marriage, defendant had, from time to time, consumed alcoholic beverages to excess. By 19 February 1965, she had become an habitual drunkard, neglecting her children, her husband, and her home. While drinking, she was abusive, crude, and generally disagreeable. In June 1963, she became obsessed with the idea that plaintiff was enamored of a lady of excellent character who was the wife of a prominent businessman and who was a member of their church. Plaintiff testified that

this "was the thing that began the real difficulty." She accused plaintiff of "psychic infidelity" with this woman. Because of this obsession, she harangued plaintiff at night until he could not sleep; she scratched, beat, and otherwise assaulted him. On one of these occasions, on 22 December 1964, when she bent his finger, plaintiff hit defendant on the forehead; it was not a severe blow. She humiliated him publicly with charges of his interest in another woman. From time to time, she locked plaintiff out of their bedroom, ordered him to leave the home, and did so many "mean, hateful things" that he said he could only attribute her violent behavior to "mental illness." On Sunday morning, 14 February 1965, after an argument over "the other woman," she attempted to push him down the cellar stairs. Plaintiff testified: "The reason for my leaving was a series — lasting for more than two years — of unreasonable drinking, of physical and verbal abuse, which ended with her pushing me down the basement stairs, that made it impossible for me to stay." On the advice of counsel, plaintiff kept a diary of defendant's misdeeds from 3 June 1964 until he left the home on 20 February 1965.

Defendant's evidence tended to show: Plaintiff is a teetotaler. She herself enjoys an occasional cocktail and sometimes has sherry with her meals, but she has never been drunk nor has she ever consumed alcoholic beverages to excess. During the entire period of her three pregnancies, and while she was nursing her children, she also was a teetotaler. She never accused plaintiff of *physical* infidelity. Her accusations of "psychic infidelity" were the result of plaintiff's own conduct. He had often told her how attractive the "other woman" was, how slim and appealing she looked in comparison to defendant, and that she had "sexy lips." He asked defendant to make friends with her and to invite her to their home. Defendant testified that she had never refused plaintiff conjugal relations. She had never attempted to injure him, nor had she ever offered him any physical violence. He, however, had kicked her in the stomach while she was pregnant. On the occasions when she had reacted to him in some unusual manner, he had deliberately goaded her into it. She did not push him down the cellar stairs. On the contrary, after he had told her he was leaving her, she had struggled with him at the top of the stairs in an effort to keep him from going to the basement "to get something that he needed to leave with." On the witness stand, she said she had always loved plaintiff; she did not want him to leave their home; she had given him no cause to leave; and she had always been ready for a reconciliation.

At the conclusion of plaintiff's evidence, defendant moved for a judgment of nonsuit as to each of the issues. The motion was denied

and renewed at the conclusion of all the evidence, when it was again denied. Exceptions to these rulings were duly noted.

Issues were submitted to the jury and answered as follows:

"1.  Were the plaintiff and defendant married, as alleged in the Complaint?

ANSWER: Yes.

"2.  Did the defendant, Vanita B. Stanback, maliciously turn the plaintiff, Fred J. Stanback, Jr., out of doors, without adequate provocation on the part of the plaintiff, Fred J. Stanback, Jr., as alleged in the Complaint?

ANSWER: No.

"3.  Did the defendant, Vanita B. Stanback, by cruel and barbarous treatment, endanger the life of the plaintiff, Fred J. Stanback, Jr., without adequate provocation on the part of the plaintiff, Fred J. Stanback, Jr., as alleged in the Complaint?

ANSWER: No.

"4.  Did the defendant, Vanita B. Stanback, offer such indignities to the person of the plaintiff, Fred J. Stanback, Jr., as to render his condition intolerable and his life burdensome, without adequate provocation on the part of the plaintiff, Fred J. Stanback, Jr., as alleged in the Complaint?

ANSWER: Yes.

"5.  Did the defendant, Vanita B. Stanback, become an habitual drunkard after her marriage to the plaintiff, Fred J. Stanback, Jr., as alleged in the Complaint?

ANSWER: No.

"6.  Did the plaintiff, Fred J. Stanback, Jr., separate himself from his wife and fail to provide her with the necessary subsistence according to his means and condition in life, as alleged in the cross action?

ANSWER: No.

"7.  Has Fred J. Stanback, Jr., unlawfully abandoned his wife, Vanita B. Stanback, without adequate provocation on the

part of the defendant, Vanita B. Stanback, as alleged in the cross action?

ANSWER:          ................

"8.  Has the plaintiff, Fred J. Stanback, Jr., offered such indignities to the person of his wife, Vanita B. Stanback, as to render her condition intolerable and life burdensome, without adequate provocation on the part of the defendant, Vanita B. Stanback, as alleged in the cross action?

ANSWER:          ................"

The following statement appears on page 325 of the record and case on appeal:

"Upon the return of the verdict the court considered the matter of the custody of Bradford G. Stanback and Lawrence C. Stanback, the minor children of the parties. The court stated to counsel that further evidence would be heard on the question of custody if either party desired to offer such evidence but that under the court's interpretation of the opinion of the Supreme Court of North Carolina in the case of STANBACK v. STANBACK, 266 N.C. 72, the question of custody of said minor children, should be determined by the verdict of the jury in the trial of the issues in this action and that the court intended to be guided by the jury verdict in determining the matter of custody."

On the question of custody, the parties then offered in evidence the identical affidavits which had been introduced in the previous custody hearings before Walker and Gwyn, JJ. These affidavits were included in the transcript when this case was here on appeal from Judge Gwyn's order at the Fall Term 1965. *Stanback v. Stanback, supra.*

The court granted plaintiff a divorce from bed and board from defendant upon the verdict. In the same judgment he awarded plaintiff custody of the two older children of the marriage. The judgment recited that the court, after considering all the evidence presented at the trial and all the affidavits previously filed ·by both parties, finds as a fact that:

"(B)oth the plaintiff and the defendant are fit and suitable persons to have the custody and control of the two older minor children, Bradford G. Stanback and Lawrence C. Stanback; that the interest, welfare and health of Bradford G. Stanback and Lawrence C. Stanback will best be served by awarding

their custody to the plaintiff, Fred J. Stanback, Jr., with visitation rights in the defendant, Vanita B. Stanback, as hereinafter set forth. . . ."

The court thereupon awarded plaintiff the custody of the two children and granted defendant the right to have them in her home during the period of 1 September through 31 May for two hours on Tuesday for three consecutive weeks and, on every fourth week, from 3:30 Friday afternoon until 5:30 on Sunday afternoon. During the period of 1 June through 31 August, she was allowed to have them from noon on 15 June until noon on 6 July, and from noon on 27 July until noon on 17 August.

The judgment further recited that the custody of the third child, Clarence F. Stanback, then aged eleven months, had not been raised in this proceeding.

In a supplemental order, Judge May fixed the compensation for defendant's counsel upon findings of fact, which are summarized as follows:

1. On 28 February 1965, defendant employed George L. Burke and the firm of Kesler and Seay, attorneys of Salisbury, to represent her in this litigation. They filed her answer, prepared for and represented her in the hearing in Asheboro before Judge Hal Hammer Walker on 10 April 1965. At this hearing, plaintiff was awarded custody; defendant was awarded alimony *pendente lite;* and defendant's attorneys were allowed $2,000.00 for their services "to the date of this hearing, to wit, April 10. 1965." From 10 April 1965 to date, defendant's counsel have received no further compensation for the additional services rendered.

2. Thereafter, they prepared this case for jury trial at the May 1965 Civil Session of the Superior Court. At that session, plaintiff moved for a continuance. The motion was argued; the trial was continued.

3. In preparation for the two custody hearings before Judge Allen H. Gwyn in June 1965, counsel conferred with 39 witnesses, prepared affidavits for their signatures, and did extensive legal research. They journeyed to Reidsville, where Judge Gwyn began his hearings, which were concluded on 19 June 1965 in Salisbury. Judge Gwyn then modified Judge Walker's order by dividing the custody of the children equally between the parties. Plaintiff appealed from Judge Gwyn's order and sought *supersedeas* from the Supreme Court. At this time, the firm of Walser, Brinkley, Walser & McGirt, attorneys of Lexington, North Carolina, was associated with Messrs. Burke, Kesler and Seay as attorneys for defendant.

4. In connection with the appeal from Judge Gwyn's order,

STANBACK *v.* STANBACK.

counsel were required (1) to investigate the rules and practice of the Supreme Court with reference to the granting of writs of *supersedeas;* (2) to study plaintiff's case on appeal; (3) to appear before Judge Gwyn in Reidsville, where he finally settled the case, which produced a mimeographed record of 223 pages; (4) to prepare and file defendant's brief; and (5) to argue her case in the Supreme Court at the Fall Term 1965.

5. Thereafter, counsel prepared for and appeared at the adverse examinations of both plaintiff and defendant. These examinations were held on two separate dates.

6. When the case was calendared for trial at the March 1966 Session of the Superior Court, counsel again prepared the case for trial. Upon plaintiff's motion, and after argument, it was again continued. Counsel also argued a motion to compel defendant to answer certain questions.

7. Counsel arranged for the taking of depositions in behalf of defendant in New York. These arrangements, *inter alia,* required the association of New York counsel.

8. When the case was calendared for the 16 May 1966 Session, counsel prepared the case for trial the third time. The case was tried and consumed nine days.

9. From the beginning of this litigation, counsel have conferred with defendant at length and at frequent intervals. The nature of the litigation and the charges which plaintiff made against defendant, and the bitterness of the litigation required these conferences and had made it necessary for them to interview many witnesses.

10. Plaintiff has a net worth of $1,000,000.00. "His average income according to his own testimony has been approximately $42,000.00 per year for the past five years, although his income-tax returns show that his total income as reported was greatly in excess of this amount, being in excess of $146,000.00 during the year 1964." Defendant has no property of any substantial value and has no income.

11. The services rendered by defendant's counsel were reasonable and necessary for the proper preparation of her defense to plaintiff's action for divorce from bed and board and the prosecution of her cross action for alimony without divorce. Counsel rendered these services in expectation of payment in addition to the $2,000.00 received on 10 April 1965. The additional services rendered by defendant's counsel had a reasonable value of $20,000.00.

Upon these findings, Judge May directed plaintiff to pay to defendant's counsel the sum of $20,000.00 "as additional counsel fees *pendente lite* covering services rendered during the period from 10

April 1965, to and including the end of the trial in this action in the Superior Court of Rowan County."

Plaintiff appealed from the order allowing defendant's counsel additional compensation. Defendant appealed from the judgment awarding plaintiff a divorce from bed and board and the custody of the parties' two older children.

*Shuford, Kluttz & Hamlin; Hudson, Ferrell, Petree, Stockton, Stockton & Robinson by Robert A. Melott for plaintiff.*

*Kesler & Seay; Walser, Brinkley, Walser & McGirt; George L. Burke, Jr., for defendant.*

Sharp, J. We first consider defendant's appeal.

Five issues were submitted to the jury in plaintiff's action for divorce from bed and board. The first related to the marriage, which was admitted. The second, third, and fifth issues were answered in defendant's favor; the fourth, in plaintiff's. To obtain a divorce from bed and board, however, the law requires that defendant establish only one of the grounds specified in G.S. 50-7. Defendant attacks, with 19 assignments of error, the judgment divorcing the parties. Necessarily, these assignments relate only to the fourth issue. Although one or more of the others have substantial merit, it is necessary to consider only the ninth, which relates to the following portion of the judge's charge on the fourth issue:

> The constant nagging and berating of the husband by the wife may, under a given factual situation, constitute indignities. A certain amount of nagging and fussing by one's wife is apparently a thing to be taken and borne as part of the "buyer-beware" marital burden of the male, but when the nagging and criticism of the husband continues practically daily for a long period of time, there is a point reached where patience is no longer a virtue, and the law should afford relief. As the Supreme Court of Georgia so well said, in Wilkinson *against* Wilkinson, quoting the trial judge: "From the days of Socrates and Xantippe, men and women have known what is meant by nagging, although philology cannot define it or legal chemistry dissolve it into its elements. Humor cannot soften or wit divert it. Prayers avail nothing and threats are idle. Soft words but increase its velocity and harsh ones its violence. Darkness has for it no terrors, and the long hours of the night draw no drapery of the couch around it. The chamber where love and peace should dwell becomes an inferno, driving the poor man to the saloon, the rich one to the club, and both to the arms of the

harlot. It takes the sparkle out of the wine of life and turns at night into ashes the fruits of the labor of the day." And to this he might well have added the words of Solomon that *"It is better to dwell in the corner of the housetop than with a brawling woman and in a wide house."* (Italics ours.)

The foregoing excerpt from the charge is taken verbatim from 1 Lee, N. C. Family Law § 82, p. 316 (3d Ed., 1963). The portion in quotations is Judge Meldrim's familiar excursus on nagging, which, since Justice Hill of the Georgia Supreme Court included it in his opinion in *Wilkinson v. Wilkinson*, 159 Ga. 332, 339, 125 S.E. 856, 859, has often reappeared in the picturesque speech columns of both legal and popular periodicals. Judge Meldrim, however, when he delivered his animadversion upon nagging, was overruling a demurrer to a complaint in a divorce action. His philippic was never intended for use by a trial judge in instructing a jury in a jurisdiction where judges are circumscribed by a statute such as G.S. 1-180. It was Justice Hill, who, after quoting Judge Meldrim, added the words of King Solomon which we have italicized above (Proverbs 25:24). To the jury, however, it was Judge May who was superimposing Solomon's condemnation upon the excoriation which he had just quoted with approval from the Georgia court. The jurors most certainly understood that his Honor thought the reference to a "brawling woman" was applicable to defendant and that Judge Meldrim's were words "fitly spoken" of her. Defendant's Assignment of Error No. 9 is sustained.

G.S. 1-180 imposes upon the trial judge the duty to state in a plain and correct manner the evidence given in the case and to declare and explain the law arising thereon, *without expressing any opinion of the facts. State v. Benton*, 226 N.C. 745, 40 S.E. 2d 617. "There must be no indication of the judge's opinion upon the facts to the hurt of either party, either directly or indirectly, by words or conduct." *Bank v. McArthur*, 168 N.C. 48, 52, 84 S.E. 39, 41. When such an indication occurs, there must be a new trial. *State v. Williamson*, 250 N.C. 204, 108 S.E. 2d 443; *Withers v. Lane*, 144 N.C. 184, 56 S.E. 855; *Meadows v. Telegraph Co.*, 131 N.C. 73, 42 S.E. 534.

Defendant's Assignments of Error three, four, five, and six attack Judge May's judgment granting custody of the parties' two boys, Bradford and Lawrence, to plaintiff.

The familiar rule is that "the welfare of the child should be the paramount consideration which guides the court in making an award of custody." *Gafford v. Phelps*, 235 N.C. 218, 222, 69 S.E. 2d 313, 316; 3 Lee, N. C. Family Law § 224 (1963); 2 Strong, N. C. Index,

Divorce and Alimony § 24 (1959). Which of the two .contending parents shall ·have the custody of their children is a question addressed to the discretion of the trial judge, who must decide the probative force of conflicting evidence and make the difficult and heart-rending decision. Once he has made it, it will ordinarily be upheld if supported by competent evidence. *Hinkle v. Hinkle,* 266 N.C. 189, 146 S.E. 2d 73; *Griffin v. Griffin,* 237 N.C. 404, 75 S.E. 2d 133.

Defendant does not controvert this rule. Her contention is that, in awarding custody, the judge did not exercise his discretion, but acted upon the mistaken premise — as shown by his statement made upon the return of the verdict — that the former opinion in this case required him to award custody to the party who won the jury's verdict.

Patently, Judge Walker's order awarding exclusive custody to plaintiff was based upon his finding that defendant had consumed excessive amounts of alcohol over a long period of time. It is equally clear that Judge Gwyn's modification of that order was based on his finding that defendant "no. longer indulged in the use of alcoholic beverages . . . and has regained her normal emotional equilibrium." In reversing Judge Gwyn's order as having been prematurely made, this Court, speaking through Higgins, J., said: "This controversy illustrates the difficulty of determining disputed facts from *ex parte* affidavits. When this case is heard on the merits, where the witnesses are before the court and subject to cross examination, the findings thus established will, or may, justify a change in the order." *Stanback v. Stanback,* 266 N.C. 72, 77, 145 S.E. 2d 332, 335.

Determining the custody of minor children is never the province of a jury; it is that of the judge of the court in which the proceeding is pending. G.S. 50-13; G.S. 50-16; G.S. 17-39; G.S. 17-39.1; G.S. 110-21(3); G.S. 7-103. See 3 Lee, N. C. Family Law § 222 (1963). In the former opinion in this case, we did not say that the custody of the Stanback children *depended* upon the jury's findings upon the trial of the issues. The import of the statement therefrom quoted above is this: (1) Judge Walker's award of custody was made *pendente lite* upon facts which he found from the *ex parte* affidavits which were the evidence before him; (2) Between the date of Judge Walker's order and the trial, ·sufficient time would have elapsed to evaluate the permanency of the change which Judge Gwyn found had occurred; and (3) At the trial, the judge who heard and saw the witnesses was empowered to alter Judge Walker's order if, after considering all the circumstances and the evidence in the case, he should find a change of custody to be in the children's best interest.

The jury found that defendant never became an habitual drunk-

ard. The judge was required to consider this finding and to evaluate it in its relation to all the other facts and circumstances bearing upon the question of custody. He apparently did consider it, for he found that defendant, as well as plaintiff, was a fit and suitable person to have custody and control of her children. Yet the judge was not required to award defendant the custody of the children upon her exoneration of the charge of habitual drunkenness any more than he was required to deprive her of custody because of the jury's answer to the fourth issue. The crucial question, the best interest of the children, remained for him to determine in the exercise of his sound judicial discretion.

The verdict in a divorce action can be an important factor in the judge's consideration of an award of custody, but it is not legally controlling. It is merely *one* of the circumstances for him to consider, along with all other relevant factors. In 24 Am. Jur. 2d, Divorce and Separation § 788 (1966), it is said that "a survey of the results of a large number of cases in the majority of states" reveals that the courts do not confine themselves to the practice of awarding custody to the innocent spouse in the divorce action. This is true, of course, because it is possible for a bad wife to be a good mother. By the same token, an erring husband can be a good father. Notwithstanding the misconduct of one of the parents in relation to the other, the welfare of their child may best be served by awarding its custody to the offending spouse where his or her fault does not reflect a present unfitness to rear the child. "This welfare can be determined to some extent by the comparative acts of the father and mother showing love and affection for it and a parental interest in its welfare." 24 Am. Jur. 2d, Divorce and Separation § 788 (1966).

The judge's statement that he understood our former opinion to require the question of custody to be determined by the jury's verdict and that — although he would hear any further evidence either party desired to offer — he intended to be guided by the verdict indicates that he was laboring under a misapprehension of the law. "And it is uniformly held by decisions of this Court that where it appears that the judge below has ruled upon matter before him upon a misapprehension of the law, the cause will be remanded to the Superior Court for further hearing in the true legal light." *State v. Grundler*, 249 N.C. 399, 402, 106 S.E. 2d 488, 490; *Capps v. Lynch*, 253 N.C. 18, 22, 116 S.E. 2d 137, 141.

Plaintiff argues, however, that the judgment indicates that the judge did, in fact, exercise his discretion in making the award of custody. Nothing contained therein, however, refutes the judge's statement that, despite his willingness to hear further evidence on

the question, he intended to be guided by the jury's verdict in awarding custody because he understood the former opinion to require him to be. His judgment is entirely consistent with his announced intention to award custody to the party who prevailed before the jury.

Since this case goes back for a trial *de novo,* there appears no immediate necessity to vacate Judge May's order of custody. Such a course would probably result in another hearing prior to the next jury trial of the action. In the absence of some showing of necessity for an earlier reconsideration, the order of May, J., will stand until the retrial. After the retrial, the presiding judge will consider the matter of custody *de novo* and enter the order which, under all the circumstances, he then deems to be in the best interest of the children involved.

### PLAINTIFF'S APPEAL.

Plaintiff states the single question posed by his appeal as follows: "Did the trial judge abuse his discretion by ordering that the plaintiff pay the sum of twenty thousand dollars ($20,000.00) as counsel fees for the defendant?" He further states that he "recognizes that the law is clear and well reasoned that the amount of attorneys' fees to be awarded to the wife in a divorce action is within the sound discretion of the trial judge and is unappealable except for abuse of discretion. *Stadiem v. Stadiem,* 230 N.C. 318, 52 S.E. 2d 899 (1949)."

Plaintiff did not except to any of the findings of fact upon which Judge May made the challenged allowance. He excepted only to "the order that the plaintiff pay the sum of twenty thousand dollars as counsel fees for the defendant." The question presented, therefore, is whether the findings of fact support the order, or — as plaintiff states — whether Judge May abused his discretion. *Putnam v. Publications,* 245 N.C. 432, 96 S.E. 2d 445; *Merrell v. Jenkins,* 242 N.C. 636, 89 S.E. 2d 242; 1 Strong, N. C. Index, Appeal and Error § 22 (1957) and cases therein cited.

*Stadiem v. Stadiem, supra,* was an appeal by the defendant-husband from an allowance of fees made to the plaintiff's attorneys under G.S. 50-16. After pointing out that, generally speaking, G.S. 50-16 runs parallel with G.S. 50-15 regarding allowances for attorneys' fees, the Court said:

> "There are so many elements to be considered in an allowance of this kind; — the nature and worth of the services; the magnitude of the task imposed; reasonable consideration for the defendant's condition and financial circumstance, — these

and many other considerations are involved. On this appeal the question before us is not whether the award may not have been larger than that anticipated or even usual in cases of that kind; but whether in consideration of the circumstances under which it was made it was so unreasonable as to constitute an abuse of discretion." *Id.* at 321, 52 S.E. 2d at 901.

Considering the circumstances under which the award to defendant's counsel was made, we cannot say that it manifests an abuse of discretion. "The purpose of the allowance for attorney's fees is to put the wife on substantially even terms with the husband in the litigation." *Harrell v. Harrell,* 253 N.C. 758, 762, 117 S.E. 2d 728, 731; *Medlin v. Medlin,* 175 N.C. 529, 95 S.E. 857. Upon the oral argument, counsel for plaintiff, answering a question from the court, said that Judge May had ascertained the amount of compensation which plaintiff's lawyers had received before he fixed the compensation for defendant's attorneys.

Defendant is a native of Nebraska; she has no relatives in this State. She owns no property and has no income. Her husband is a man of wealth and a member of a prominent and well-established North Carolina family. In this action, he seeks a decree which would relieve him of all obligation to support defendant and from all responsibility to her. In the beginning, at least, he sought to deprive her of all contacts with the children then born of the marriage. The ends of justice require that both sides of a controversy such as this be fully explored and presented to judge and jury before decision is made. Defendant was, and is, entitled to adequate representation. Such representation, under the circumstances disclosed here, is not always readily available to a wife. Many attorneys are reluctant to take domestic relations cases under any circumstances, for the demands which a bitterly contested divorce and custody case make upon the lawyers involved are time-consuming, strenuous, and tension-creating. This is more especially true of the demands which the penniless wife makes upon the time of her attorneys, for her dependence upon them is absolute. There are few lawyers who would be willing, or could afford, to take her case without the expectation of receiving adequate compensation in the end — and recompense is frequently delayed.

After reading the 247 pages of record and briefs in the first appeal of this case and the 446 pages in this one, we are satisfied that the facts which Judge May found support his award.

The decision is this: The judgment awarding plaintiff a divorce from bed and board is vacated, and a new trial is ordered upon all issues arising upon the pleadings. The judgment awarding custody

stands until the retrial of the issues unless, for good cause shown, earlier reconsideration should become necessary. After the retrial, the judge will consider the question of custody *de novo*. The judgment awarding defendant's attorneys compensation is affirmed.

On plaintiff's appeal

Affirmed.

On defendant's appeal

New trial.